FINDINGS AND CONCLUSIONS
SHADUR, District Judge.
Defendant Khalid Yousaf Malik was charged in a one-count indictment with knowingly and intentionally attempting to distribute heroin from on or about October 27, 1980 through and including December 10, 1980[1] in violation of 21 U.S.C. § 846. On May 12, 1981 defendant, having been fully advised of his right to a jury and all related rights, waived a jury trial both orally and in writing. Upon the Court’s approval of and the government’s consent to such waiver (both also in writing), the case was tried without a jury (Fed.R.Crim.P. 23(a) having been complied with). During such advice of defendant’s rights and waiver of the jury trial, as well as throughout the bench trial, John Hansen, an interpreter of the Urdo language, was present.[2]
At the commencement of trial the government called as its first witness a one-time fellow inmate of the defendant, Michael Richards (“Richards”), who was being held at the United States Metropolitan Correctional Center in Chicago (“MCC”) subject to an extradition warrant on charges of a bank robbery in Scotland. Richards testified to conversations with defendant while both were in custody at the MCC. Upon the completion of Richards’ testimony May 14, 1981 the trial was recessed until June 10, 1981.
Upon resumption of the trial the government called two Drug Enforcement Administration (“DEA”) agents who met with the defendant in undercover capacities, Christine Higgins (“Higgins”) and Brian Maas (“Maas”); DEA Agent Michael Streicher (“Streicher”), who took part in the December 10 arrest of defendant; and a young woman named Mitchelle Kmiec (“Kmiec”), who testified as to her conversations and correspondence with defendant. Finally the government offered a stipulation (G.Ex. 27) that related primarily to a prior similar act of defendant, beginning about August and continuing through October 16 involving defendant’s admitted importation and possession of heroin. Defendant had stipulated to those facts but objected to their relevancy.
Defendant offered in his case in chief an additional stipulation as to bank transactions in which defendant was involved from October 9 through October 15. In rebuttal the government offered a stipulation regarding similar bank transactions and some of the same transactions occurring from September 26 through October 15. In addition, the stipulation concerned the balance of certain bank accounts on relevant dates and testimony as to the value of heroin.

Findings

Except as otherwise indicated in these Findings, both the specific and the general findings that follow this paragraph are based on evidence that supports them beyond a reasonable doubt. To avoid the cumbersome over-use of language the words “find” and “beyond a reasonable doubt” have been omitted in favor of using declarative sentences, but all such sentences *787 are intended to and do carry the intended findings to that effect.
From about August through October 16 defendant engaged in a conspiracy with his cousin, Arshad Ali Malik (“Arshad”), to import heroin into the United States at Chicago from Pakistan. In implementation of that conspiracy defendant caused a package to be shipped to Javed Butt in Hinsdale, Illinois with the intention that 18 heroin-filled baseballs in that package be delivered to Arshad. On October 16 defendant and Arshad were arrested and incarcerated at the MCC after they had taken possession of the 18 baseballs (that arrest led to indictment in 80 CR 647).
Before that date defendant had sent another package containing baseballs to Kmiec, an innocently involved Chicago area resident. She had met defendant in October 1979 on a vacation flight to Casablanca with her mother. They then engaged in correspondence, and Kmiec again met defendant in Chicago in May 1980 at Arshad’s apartment. In August she received a letter from defendant’s secretary bearing the return address Corona Impex, P.O. Box 199, Sialkot, Pakistan (G.Ex. 18A) and a postcard from defendant (G.Ex. 18B) stating defendant would be in Chicago in the first week of September and would see her then. Defendant did not however call her then.
On September 20, about 3 weeks after her birthday, Kmiec received a package addressed to her bearing the same Pakistan return address as the earlier letter. To her surprise two blouses and 36 baseballs were enclosed in the package. On the next day (a Sunday) she received a telephone call from Arshad and told him both of her receipt of the package from defendant containing baseballs, though she didn’t know why, and of the earlier letter. Kmiec told Arshad that he could pick up the baseballs the following day but that if he didn’t want them she would give them to her brother who works with youngsters at the YMCA. On the next day (Monday, September 22) Arshad arrived at her home alone and picked up 12 of the 36 baseballs.
On the evening of October 2, just two weeks before defendant’s arrest in 80 CR 647, defendant and Arshad came to Kmiec’s house in a Yellow Cab taxi. Kmiec thanked defendant for the two blouses and again explained that she would give the remaining 24 baseballs to her brother if they didn’t want them. Defendant told her he could get her brother any sporting goods he needed. After visiting for approximately two hours, defendant and Arshad left Kmiec’s house together and reentered the taxi, which had waited for them during their visit. They took the remaining 24 baseballs with them.
Kmiec described in detail the baseballs and how they were packaged. That description was strikingly similar to the description (G.Ex. 27) of the baseballs and packaging materials later sent by defendant to Javed Butt. Kmiec viewed photographs and the actual balls and packaging material from that other shipment and stated they were substantially the same as those she received. Parallels between the two shipments include the following:
(1) Each shipping package was delivered by air mail.
(2) Each shipping package had the name of a Sialkot, Pakistan import company as a return address.
(3) Each shipping package had a gauze-like cloth covering sewn over a cardboard box.
(4) Each cloth cover bore destination and return addresses hand printed by some type of black marker.
(5) Each package was shipped by defendant to a third party and then picked up by Arshad (in one instance alone, and in the other together with defendant).
(6) Each shipping packáge was marked as containing “free samples of no commercial value.”
(7) Each shipping package contained other items as well as baseballs.
(8) All the baseballs were white, stamped “MADE IN PAKISTAN” with red English printing and sewn with red thread.
*788 (9) Each baseball was packaged individually in a plastic baggie and then placed in a cardboard packing box (six to a box).
(10) Each packing box was made of thin, very cheap cardboard with white background and the same red English printing and designs on the box top.
It was stipulated that the 18 baseballs shipped to Javed Butt contained an average , of approximately 51 grams net weight (about two street ounces) of 86% pure heroin. In light of the similarities listed above and defendant’s statements to Richards discussed below, each of the 36 baseballs shipped to Kmiec also contained approximately two street ounces of heroin. On that basis the last 24 baseballs contained approximately three pounds of heroin (a quantity somewhat less than lVz kilos).
From the day Arshad picked up the first 12 baseballs (September 22) until the day of defendant’s arrest in 80 CR 647 (October 16), defendant engaged in several banking transactions. During that period he wired $45,440 to bank accounts in Pakistan ($30,-240 to the Karachi account of an Idrees Elahi and $15,200 to his own account in Lahore, Pakistan). In addition he made purchases of traveler’s checks or deposits totaling $16,000. During the same period Arshad wired $9,000 to the same Idrees Elahi account. Most of this money was tendered in cash by defendant to Chicago banks, which completed the wire transactions, and was allegedly being sent on behalf of other individuals.
It is not possible from the record to determine the source of such funds with any degree of certainty. They could stem from the proceeds of narcotics sales (whether from the baseballs or otherwise) or from other sources of income, such as defendant’s claimed surgical instrument business. For purposes of this ease the assumptions most favorable to defendant are that all such funds represented narcotics sale proceeds and that defendant had access to no narcotics other than the 36 baseballs picked up from Kmiec. Even under those assumptions the total of $70,440 handled by defendant and Arshad between September 22 and October 16 is far below the value of the heroin contained in the first 12 baseballs picked up by Arshad (such value was about $140,000 “wholesale” and many times that if cut and packaged for street distribution). All the evidence therefore indicates the continued availability to defendant on December 10 of the approximately lVz kilos of heroin in the last 24 baseballs.
When defendant was bonded out of jail December 10 he had little money in the Chicago area, for his bank account at the Albany Bank and Trust Company of Chicago had a balance of only $1,142.93 during the entire time of his incarceration up to December 10. After November 24 there was no balance to his credit in the other United States bank to which he was known to have made deposits, Citibank, N.A., New York, New York. Arshad had a balance in his Chicago account of only $33.18 during the same period. Another of defendant’s cousins, Naeem Akhtar Malik (“Naeem”), deposited a total of $43,700 into an account at the First National Bank of Chicago to be used as bond for defendant. That sum comprised the proceeds of two Canadian Imperial Bank of Commerce cashier’s checks dated November 5 and November 26 (totaling $16,300); an $8,000 cashier’s check of the Christiania Bank of Oslo, Norway dated November 19; a $10,000 cashier’s check of Landesbank of Kiel, West Germany dated November 12; and two cashier’s checks issued by the Bank of Ravens-wood, Chicago, Illinois October 14 (totaling $7,000). With the exception of one $3,500 check all were made payable to Naeem and all were endorsed by him. None of the funds was deposited with the First National Bank of Chicago until December 1 and 3. Thus the principal part of the funds eventually used to make bond for defendant came from outside the country. Even on the most favorable assumptions referred to in the preceding piaragraph (assumptions that are highly improbable in relation to the funds referred to in this paragraph), the conclusion stated in the last sentence of the preceding paragraph remains valid and is hereby reconfirmed.
*789 We return to October, after defendant was indicted in 80 CR 647 and held at MCC subject to a $250,000 cash bond. Defendant initiated discussions with fellow inmate Richards October 19 or 20. Defendant asked Richards if he had any friends in London who would be interested in the heroin business and offered to go into business with Richards after Richards got out of jail (Richards said he had a friend in Chicago who dealt in narcotics and that Richards had $100,000 available to him). They also discussed sending heroin over to London. Defendant told Richards his bond was set at $250,000 and asked about Richards’ bond. He offered to take Richards to Pakistan after he got out to show Richards defendant’s methods of heroin smuggling and to allow Richards to choose the methods he thought best in sending heroin to Great Britain. Defendant also said he had 1V2 kilos of 86 — 91% pure heroin in Chicago he wanted to sell. Richards responded that he had a friend named “Bob” in Chicago who might be prepared to buy some of the heroin and that Richards might be willing to put up some of the $100,000 he had available.
On the morning of October 27 defendant told Richards he was going to the Federal Building for a bond reduction hearing. Richards said that if he could help out he would. Later that same day defendant again came to Richards, said that his bond had been reduced from $250,000 to $50,000 and asked Richards to see whether his friend Bob would put up the $50,000 in exchange for the delivery after defendant’s release of the IV2 kilos of heroin defendant had in Chicago. Richards responded that there would be no security to assure such delivery. Defendant suggested that the funds be put up with his attorney. Defendant explained Bob could then sell the heroin, deduct the money he had provided for bond and then split the remainder of the proceeds with defendant. According to defendant the heroin was 86-91% pure and “probably the best Chicago has ever had.”
Richards again responded that Bob would not have the collateral needed in order to front $50,000. Defendant suggested that he and Bob could go to a bar upon defendant’s being released, and defendant would leave the bar, obtain the heroin and then return and give it to Bob. Richards said that method of delivery would be unacceptable. Instead he counter-suggested that once at the bar with Bob defendant should call his friend who had the heroin in safekeeping and have the friend deliver the heroin to the bar. Defendant did not agree, gave his lawyer’s business card (G.Ex. 4) to Richards and broke off the discussion at that point.
Later the same day (October 27) defendant told Richards about the method he had followed to place the heroin into baseballs and ship it to the United States. After the center core had been removed and weighed, a like weight (two ounces) of heroin would be placed in the center of the baseball, which would then be reformed and restitched.
On November 18 defendant renewed the heroin-oriented conversation with Richards while playing gin rummy. Defendant asked Richards whether it would be all right, if Richards was still in jail, for Bob to go over to Pakistan to see defendant’s sports factory used for processing the heroin, and to obtain Bob’s input in selecting the method of importing the heroin. Defendant assured Richards he and his associates had successfully sent heroin into Chicago and New York. Defendant mentioned the various means he had used to smuggle the heroin, such as baseballs, tennis balls, cricket balls and furniture legs. Defendant said the heroin was shipped from Pakistan by air mail and air freight in packages marked as “free samples.” His contacts sent him the money in return by some kind of check. Defendant also said he had just traveled throughout Europe meeting with his heroin contacts there.
In the same conversation defendant repeatedly asked Richards if Bob would post the $50,000 bail money. Defendant again said that when Bob got the heroin he could sell it, take his $50,000 off the top and then halve with defendant whatever was left. *790 Defendant said he would personally take Bob to his stash in Chicago and get him the lVi kilos of heroin. Defendant also gave Richards a sheet of paper on which he had written his and Arshad’s addresses and phone numbers and told Richards to use those addresses to mail him letters or orders for heroin.
Later that same evening defendant brought a note to Richards’ cell (G.Ex. 2) and asked him to act on it as soon as possible. That note urged Richards to call his friend in the morning about providing the bond money and to let defendant know the results of their conversation.
On November 27 defendant and Richards had a further conversation. Defendant explained that his cousin Naeem had come over from Norway through Canada to Chicago and had brought $42,000 with him. Defendant then asked Richards if Bob could supply the $8,000 balance needed to post his $50,000 bail, again in exchange for the IV2 kilos of heroin. Richards said that would offer no problem. When defendant asked if that were so even without collateral, Richards responded affirmatively because, he said, $8,000 was different from $50,000.
Later the same day the conversation was renewed on the same basis. Defendant then came to Richards’ cell and on a piece of paper towel wrote down as his cousin’s telephone number 975-7473, with the name Mr. Khalid (G.Ex. 3). Richards said he would call Bob, make arrangements for Richards’ wife to get the $8,000 from the bank, call the number and make the bonding arrangements with defendant’s cousin.
Richards had met with DEA agents November 14 and 19 and met with them again December 2. Undercover telephone calls were placed by DEA Agents Streicher and Maas December 2 and December 3 to the number furnished by defendant. Streicher initially took on the identity of “Bob.” In his third telephone call he talked to an individual who identified himself as Naeem and said he had been asked to get money from Bob, from whom he had been told he could obtain $8,000. Naeem explained that he had about $35,000 and could obtain the other money the next day. Streicher responded he would call Naeem the next day.
On December 3 Maas, an agent brought in from out of town who would not be recognized by defendant or people in the Federal Building, took over the role of Bob from Streicher. Maas telephoned the same number and was told by Naeem he was getting his money together. They agreed to meet at 2 p. m. to work out the details. Naeem provided his address of 810 West Grace Street, Chicago, Illinois (that proved to be a multi-story apartment building).
About 2 p. m. Maas (posing as “Bob”) met with Naeem and discussed the financial aspects of securing defendant’s release and the delivery of heroin. Maas asked if he could obtain the heroin before defendant’s release. Naeem responded there was no way that could be done, as that would reduce his bargaining power and defendant could not then personally supervise the delivery. Naeem also said he was having trouble clearing the checks that he had brought to the United States and placed in an account at the First National Bank of Chicago (the “Bank”).
Maas then drove Naeem to the Bank, where Naeem inquired and told Maas that not all the checks had cleared. Maas and fellow DEA undercover Agent Higgins (posing as “Bob’s” girl friend) drove Naeem back to the Grace Street apartment building. En route Naeem said he would be receiving a telephone call from defendant that evening. About 8 p. m. December 3 Maas again met with Naeem at the Grace Street building. Naeem said defendant had in fact called about 7:30 p. m., that defendant had said there was no way that the heroin would be delivered until he was released from the MCC but that the transaction would be handled promptly once defendant was out.
On December 4 Maas met with Naeem and an unidentified male Pakistani at the Bank. After a few hours at the Bank, Naeem told Maas that several of the international checks had still not cleared the account, so only $35,000 was still available. Maas offered to try to use his contacts at *791 the Bank, and Naeem agreed. Later that day Naeem gave Maas the passbook for Naeem’s account into which he had deposited the $42,700 (G.Ex. 12).
On the same day (December 4) Richards and defendant again discussed matters in the MCC. Defendant again said he would take Bob to his “safe” stash once he was released and explained that “it wouldn’t be any more than two hours before he would take him over there.” Defendant also said he wanted to go to California with Bob to pick up another 3 kilos, to be sold to obtain funds to get Arshad out of jail. Defendant told Richards he was also going to talk to Bob about going to Pakistan. Defendant said he was very happy with the way things had gone down on the outside and that Bob was doing okay. He told Richards, “You’ve got a very good man there.”
On December 9 Maas again called the telephone number defendant had provided and talked to an individual who identified himself as Arthur Malik. Maas left word that he would meet with Naeem at the Bank that morning. Later that morning Maas met at the Bank with Naeem and an individual who introduced himself as Arthur Malik (“Arthur”). After both those individuals had gone to the customer service window, Naeem returned and said there was only $32,700 available for withdrawal. About 1:20 p. m. Maas, Naeem and Arthur left the Bank and went their separate ways, agreeing to meet the following morning. Maas thereafter obtained approval from DEA supervisors to provide a total of $15,000 for bail. About 2:20 p. m. Maas called Arthur at the 975-7473 number and said he would supply the $15,000 needed for bail.
On that same day (December 9) defendant again engaged in heroin-related conversations with Richards. Defendant said Harry Cannon had offered him $300,000 for the IV2 kilos of heroin in Chicago and that it would be good to have one more contact in Chicago. Defendant also said he wanted to be back in Pakistan by that weekend and that Bruno Mancini, another inmate, was going to supply him with a passport.
About 10:10 a. m. December 10 Maas met with Naeem and an unidentified Pakistani male at the Bank. By 11:30 a. m. Maas, Naeem and the unidentified male were at the office of the Clerk of this Court attempting to post bond. ' When the Clerk would not accept the $32,700 in cashier’s checks they returned to the Bank and obtained cash. About 2:30 p. m. the cashier at the Clerk’s office accepted $35,000 in cash from Naeem and $15,000 from Maas (G.Ex. 13). Defendant was finally released by the Immigration and Naturalization Service about 4:55 p. m.
Upon his release defendant greeted “Bob” (Maas) and attempted to kiss him in an expression of gratitude for his release. All four individuals (defendant, Maas, Naeem and the unidentified male[3]) then entered a car being driven by Higgins. Higgins then drove to One East Wacker Drive in Chicago where the taxi had been towed. For the next two hours defendant was voluntarily in the company of either or both of Higgins and Maas. Both agents testified to conversations they had with defendant. Two tape recordings were also admitted into evidence, deriving from two different receivers recording the transmissions of the Kel set worn by Higgins. Although the recording is often of poor quality it does corroborate most aspects of the agents’ testimony as well as that of Richards.
In those conversations defendant acknowledged prior discussions with Richards inside the MCC. Once in the car, Maas said he had some business to do with defendant. When the undercover car arrived at One East Wacker Drive both the unidentified male and Naeem left the car to retrieve the taxi. Defendant expressed no desire to leave the car, nor did he attempt to do so. *792 They did, however, circle the block to pick up Naeem. While they were circling the block in rush hour traffic defendant said he did not want to talk business in front of Naeem. Defendant told Maas that the quantity involved was IV2 kilos of 90% pure heroin, but explained that he was nervous and would like to complete the heroin transaction the next day. When the undercover car arrived back at One East Wacker, defendant again made no effort to leave the car. Maas learned on inquiry that Naeem and the other individual had left the area, and the agents and defendant proceeded north from the Loop to the area of Irving Park and Broadway in Chicago.
En route defendant and Maas continued to discuss heroin. Maas said he was receiving pressure from his people to complete the delivery as soon as possible, preferably that night. Defendant responded that he wanted to “do the deal” the following day, that IV2 kilos were available and more could be obtained in the future (as much as 100 kilos in a short time), that his past Chicago connections were not good (one still owed him $200,000) and he was only interested in good connections.
Higgins parked the undercover car at a Standard Station where Maas left the car to use the phone (that call was in fact to Maas’ DEA supervisor Joseph Salvemini [“Salvemini”]). Maas testified that before he left the car defendant pointed to Higgins and indicated to Maas he did not wish to talk in front of her.[4] While Maas was calling, defendant talked with Higgins about Pakistan and also asked her if she knew about the “deal.” Defendant said that he was nervous, that police might be watching, that it was necessary to take time, not to hurry, to be careful and relaxed and think about everything.
When Maas returned to the car about 6:30 p. m., he asked defendant if he’d leave the car with Maas to talk. They walked to a nearby diner and further discussed the “deal” and their future heroin distribution business. Defendant again said he did not want to deliver the heroin that night. Instead he told Maas to communicate with him at 810 West Grace at 10 a. m. the next morning and defendant would get the heroin within two hours. During the 15 to 20 minute conversation defendant offered to take Maas to Pakistan, where defendant had hundreds of kilos of high quality heroin. If things went smoothly he said he would like Maas to handle his United States heroin distribution network (defendant said he had 20-30 customers throughout the United States who were capable of handling 5 to 8 kilos of heroin a month). Defendant said he would like to arrange for future payments in Europe, since he planned to leave the United States because of legal problems. Maas and defendant then returned to the car, after which Maas again left and made a call to Salvemini.
During Maas’ first call to Salvemini he reported on the conversations with defendant to that point, saying he (Maas) didn’t think the deal would go that day but he would try again. Salvemini instructed Maas not to leave defendant alone until a decision had been made as to whether the DEA agents would wait until the following day or would arrest defendant immediately. During the second call Maas reported to Salvemini on his further conversation with defendant. Though he did not refer to defendant’s specific 10 a. m. suggestion, Maas said he had decided the deal would not go that day.
Streicher, who was with Salvemini during the telephone calls, wanted to carry over surveillance to the following day (when Maas reported defendant wanted “to do the deal”). It was Salvemini’s authority as a matter of field judgment to make that decision, with the basic concept being not to let defendant get away. Salvemini decided that although nearly 20 agents had been involved in surveillance off and on during the day, the risk factors involved in permitting defendant to go to 810 W. Grace *793 Street[5] called for arresting defendant that evening. Accordingly he instructed Maas in the second telephone conversation to get Higgins out of the car, and Maas did so on the pretext that someone wanted to talk to her.
About 7 p. m. Streicher and Salvemini arrived on the scene, entered the undercover car and advised defendant he was under arrest. After being advised of his Miranda rights, 'defendant acknowledged that he understood those rights. Streicher then told defendant they were aware that he had IV2 kilos of heroin in Chicago and 3 kilos in California and asked if he would tell them where the heroin was hidden. Streicher said many people could die if it hit the streets and pleaded with defendant to tell them where it was. Defendant then told the agents that if they would promise in writing before his attorney not to prosecute him for the heroin, he would tell them where it was hidden. No such promise was made and defendant said nothing further.

Conclusions 
[6]

All too often the distinction between “preponderance of the evidence” and “beyond a reasonable doubt” is purely semantic, one to which we pay only lip service. This case however illustrates, in a classic way, that the rule has real meaning and utility. Were this Court, as the finder of fact in this bench trial, called upon to decide whether a simple preponderance of the evidence confirmed the elements of the crime charged against the defendant, it might well have to rule for the government. But it cannot in good conscience determine that a reasonable doubt as to defendant’s guilt does not exist — and that is after all the applicable test.
Defendant is charged with an intentional attempt to distribute heroin. Defendant challenges both elements (quoting from Def.Mem. 2):
First, the evidence did not show beyond a reasonable doubt that Malik’s intent, as it might be revealed by his words, his actions, and the external objective circumstances, was to distribute heroin.... Second, the evidence did not show beyond a reasonable doubt, conduct by Malik that would constitute a substantial step in furtherance of an intent to deliver heroin.
As in many attempt cases, the uncontroverted evidence is that defendant announced (in this case again and again) that he intended to distribute heroin. Under those circumstances what are stated as two issues really reduce to the single question whether defendant’s intention was really as he stated.[7] Courts’ inquiries into whether defendants’ actions are “substantial steps” or “mere preparation” toward the commission of the substantive offense (inquiries made in the name of defining what constitutes an “attempt”) illuminate whether the required intention to commit the crime has been proved beyond a reasonable doubt.
This Court has found that the reasonable doubt standard has been satisfied as to defendant’s having the capacity to deliver heroin: ownership or control (or both) of a large quantity of heroin of an extraordinarily high degree of purity. Nor does the Court have any difficulty in believing that defendant is a thoroughly bad man, a heroin dealer who has apparently been substantially responsible for two deaths stemming from the use of another batch of the same product. But we cannot convict de *794 fendants for being evil, for committing offenses other than that charged in the indictment. Our Court of Appeals has had occasion (United States v. Gallagher, 565 F.2d 981, 985 (7th Cir. 1977)) to make precisely that point, albeit in a different context:
We all respect the ancient rule stated by Chief Justice Marshall in The Schooner Hoppet & Cargo v. United States, 11 U.S. (7 Craneh) 389, 394, 3 L.Ed. 380 (1813):
The rule that a man shall not be charged with one crime and convicted of another, may sometime cover real guilt, but its observance is essential to the preservation of innocence. . . .
On the issue of what evidence will sustain conviction on an “attempt” charge our Court of Appeals (United States v. Green, 511 F.2d 1062, 1072 (7th Cir. 1975)) has quoted and applied the formulation expressed in United States v. Mandujano, 499 F.2d 370, 376 (5th Cir. 1974), cert. denied, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975)
Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant’s criminal intent.
Accord, all requiring unequivocal acts not reasonably explainable except as steps toward committing the crime, United States v. Monholland, 607 F.2d 1311, 1318, 1320 (10th Cir. 1979); United States v. Stallworth, 543 F.2d 1038, 1040, 1041, especially 1041 n.7 (2d Cir. 1976); United States v. Oviedo, 525 F.2d 881, 885, 886 (5th Cir. 1976).
Here there are plainly three possible explanations of defendant’s conduct. True enough he could have, as the government asserts, intended to go through with the “deal” as he had discussed it with Richards and then Maas. But he could also have intended to use Richards and Maas solely as a vehicle for being freed from custody, planning to stall (as he did) until he was left alone and then to flee without delivery. Or he could have intended to make the attempt to flee if the opportunity presented itself and to deliver the heroin only if it did not, or if he perceived himself to be in danger. In terms of sheer probability the last alternative (really acknowledged by neither the government nor defendant[8]) is most likely. But we look not to degrees of relative probability but to reasonable doubt.
There is at least a reasonable doubt of defendant’s intent. Had he unquestionably intended to deliver heroin, there would have been no reason for his consistent and stubborn resistance to Maas’ urgings for delivery on the day of his release. Indeed the government’s proposed findings simply assert without support that:
but for the fact of his arrest on December 10, 1980 the evidence supports a finding that he would, in fact, have delivered that heroin.
Surely that is not so beyond a reasonable doubt, for the government really offers no satisfactory explanation of defendant’s resistance to delivery on December 10 to displace the obvious one: defendant’s desire not to deliver the heroin but to avoid such delivery.[9]
*795 In fact the government’s own decision to arrest defendant December 10, the field judgment made by Salvemini, plainly reflected a “reasonable doubt” as to defendant’s intention. In a real world sense, had such doubt not existed on the DEA’s part the decision would have been to await the morrow when defendant could have been caught in the act and indicted for the substantive offense and not for an attempt. If the government, with full contemporaneous knowledge of all the facts, had a reasonable doubt this Court can have no less.[10]
For the foregoing reasons this Court concludes that the government has not met its burden of proving all the elements of the crime beyond a reasonable doubt. Defendant is found not guilty and a judgment of acquittal is entered.[11] \

. Because the entire period charged in the indictment fell within calendar year 1980, these Findings will not designate the year involved when referring to 1980 dates.

. Defendant had more than a reasonable command of the English language, having traveled in the United States and the United Kingdom and having carried out all of the discussions referred to in these Findings in English. To assure defendant a fair trial the Court authorized the interpreter to act, having found (based on defendant’s concurrence) that the interpreter was qualified to provide defendant with simultaneous interpretation of the entire proceedings.

. Though the unidentified male had driven a taxi to the Federal Building, other government agents had punctured its tires to eliminate one potential means of escape — or added need for surveillance — after defendant’s release. Because the taxi was then towed away, its driver also rode in the undercover car.

. Both because Higgins did not confirm such a gesture and (more importantly) defendant mentioned the “deal” directly to Higgins (see the next sentences in the text), the making of the gesture has not been established beyond a reasonable doubt.

. Two or three agents would be needed to cover each building entrance and exit. Surveillance within a high-rise apartment building is difficult. It was not possible to gain access to the underground parking area, which could be a possible means of escape. It would be difficult to survey any agreed-upon meeting place the next day. Streicher however felt all these difficulties could be overcome.

. This section includes conclusions both of fact and of law.

. On that score Def.Mem. 2 goes on to state a greater burden for himself than the law requires:
The evidence presented at trial was equally consistent with an intent by Malik to promise a distribution of heroin in order to gain release on bond and thereby not distribute a controlled substance.
Probative equality is not of course the criterion, but rather whether the evidence creates a reasonable doubt as to intention.

. Defendant essentially argues only the “hoax” theory. In turn the government responds by advancing facts it claims inconsistent with a hoax. Those facts, however, are consistent with an intention on defendant’s part to flee when he was left at the Grace Street building overnight, wishing to avoid the confrontation that would result from seeking to flee the day he was released (Richards testified he had told defendant his friend Bob “had a piece [a handgun] and knew how to use it”). It should be remembered that defendant believed that Bob was an individual and not (as was the true situation) one of a host of DEA agents capable of covering every means of departure from a high-rise apartment building. If the DEA viewed arrest as imperative because of its belief in the difficulty of effective surveillance once defendant reached the building, can it argue that defendant might not reasonably have had the same belief?

. Acceptance of the government’s position essentially implicates taking defendant’s expansive promises to Richards and Maas at face value. That puts some strain on credulity, for it requires us to accept the proposition that on such minimal contact defendant — admittedly a major drug dealer — would move a stranger into a key position of importance in his distribution *795 network. There is at least a reasonable doubt that the promises were being used as bait to accomplish defendant’s goal of placing himself in a position to flee.

. Though stated in a different context, the Fifth Circuit’s language in Oviedo, 525 F.2d at 886, casts light on the problem posed here:
it is also impossible to infer that [criminal] intent when objective facts indicate that the person did not carry out his self-proclaimed intention.... Based on these objective facts, we cannot infer that he intended to do that which he said he was going to do, because he in fact did something else.
Unfortunately the government’s decision to move in on Malik early, though it may have made good sense as a field judgment, left open the reasonable doubt — the possible inference— that precludes a finding of guilt.

. This decision is reached with full recognition that critics of the courts who look only at defendants and not at evidence may view it as support for their decrying a judiciary “soft on crime.” That is unfortunately part of the price that must be paid for adherence to our basic precepts of justice and the Constitution.